James N. STEPHENSON, Adelheid M. Jacobsen and Frame It, Inc., Plaintiffs,

v.

The GREAT FRAME UP SYSTEMS, INC., and Pumpkinseed, Inc., Defendants.

No. CIV. 98–6022–TC.

United States District Court, D. Oregon.

Jan. 8, 2002.

---

Terence J. Hammons, Hammons & Mills, Eugene, OR, for Plaintiffs.

Alan J. Leiman, Harrang Long Gary Rudnick, P.C., Eugene, OR, for Defendants.

## ORDER

COFFIN, United States Magistrate Judge.

Defendant, the Great Frame Up Systems, Inc. (GFU)[1], alleges that plaintiffs

1. As I will discuss in more detail later, GFU is no longer the real party in interest in this case, all such interest having been assigned to two individual former shareholders as part of a stock purchase agreement.

James Stephenson and Adelheid Jacobsen have violated the terms of a Stipulated Judgment executed by the parties. Defendant seeks an order declaring that plaintiffs have violated the terms of the Stipulated Judgment, and awarding penalties for violation of the Stipulated Judgment. Defendant also seeks a declaration that the balance of the money judgment provision of the Stipulated Judgment is owed to defendant as a result of plaintiffs' violation of the Stipulated Judgment. This court held two evidentiary hearings on the matter.

## FACTUAL BACKGROUND

In 1997, plaintiffs sued defendant GFU for breach of a license agreement. Defendant GFU counterclaimed. The license agreement at issue concerned plaintiffs' operation of a GFU framing store located on West 11th Avenue in Eugene, Oregon. The license agreement included a provision that plaintiffs would not participate directly or indirectly in any framing business located within ten miles of the West 11th location for a period of two years following termination of the license agreement. Plaintiffs violated the terms of the licensing agreement when, following termination of the license agreement, they continued to operate a retail framing store at the same location. Defendant's counterclaim included a claim for injunctive relief enjoining further operation of plaintiffs' framing store.

*The Stipulated Judgment and Covenant Not to Execute Judgment*

On September 3, 1998, immediately prior to a hearing on defendant's motion for preliminary injunction, the litigation was resolved by Stipulated Judgment. The Stipulated Judgment contains several provisions that are relevant to defendant's present motion. Section III contains the following injunction which replicated a provision to the same effect that was in the license agreement at issue:

> Plaintiffs are enjoined for a period of two years from the date of the Stipulated Judgment from operating or participating in the operation of, or continuing to participate in the operation of, or from acquiring any financial or beneficial ownership interest in any business in which picture frames or picture framing components (including matte board and glass) are produced and sold and which is located within 10 miles of the former location of the Great Frame Up framing store on 2190 West 11th Avenue, Eugene, Oregon. More particularly, plaintiffs are enjoined hereunder for the time period specified herein, from any further operation of the 'Frame It' framing store located at 2190 West 11th Avenue, Eugene, Oregon.

Stipulated Judgment, p. 2, Exh. 1 to Leiman Affidavit (# 30).

The Stipulated Judgment also grants judgment in favor of defendant in the amount of $65,000 plus interest.[2] In a separate Covenant Not to Execute Judgment, also entered on September 3, 1998, defendant agreed that upon payment of $20,000, it would not execute on the balance of the $65,000 judgment provided that plaintiffs abided by the terms of the Stipulated Judgment. The Covenant Not to Execute Judgment also grants defendant the ability to seek execution of the judgment and interest in the event of a violation of any provision of the Covenant Not to Execute Judgment or the Stipulated Judgment.

The Stipulated Judgment provides for injunctive relief and penalties if plaintiff is found to have violated terms of the Stipu-

---

**2.** The parties have stated that the $65,000 represents attorney fees incurred by defendant in the action.

lated Judgment. Pursuant to the terms of the Stipulated Judgment, defendant, upon belief of a violation, is entitled to move the court for an Order to Show Cause for violation of the Stipulated Judgment. The Stipulated Judgment provides that should the court find that plaintiffs violated the non-competition provisions set forth in Section III, the court "shall order each plaintiff involved to pay a penalty of $1,000 for each such violation." *Id.* at p. 3.

The Stipulated Judgment provides that each week any provision of the Stipulated Judgment is being violated constitutes a separate violation. The Stipulated Judgment includes an acknowledgment by plaintiffs that the parties have fixed this liquidated penalty provision because the damages that would be suffered by defendant as a result of a violation are difficult to measure. The parties agreed that the liquidated penalty provided would be a reasonable estimate of the actual damage that defendant would suffer as a result of a violation.

The Stipulated Judgment also contains a statement that the Judgment represents the complete agreement of the parties.

At a hearing on defendant's motion for an order finding plaintiffs in violation of the injunction, this court inquired whether GFU had any current franchises in the Eugene area. The ensuing discussion and filings eventually led to the revelation that GFU has had no licensees in the area since plaintiffs operated a franchise, and indeed has had no real stake in this litigation since April, 1998—some five months before the Stipulated Judgment was executed.

## I.

*WHETHER THE CIRCUMSTANCES JUSTIFY ENFORCEMENT OF THE ORIGINAL INJUNCTION IN ITS ENTIRETY*

GFU was incorporated in the State of Delaware and remains an active corpora-

tion. Since 1975, and continuing to date, GFU has franchised picture framing stores throughout the United States. GFU currently has over 100 franchised picture frame stores and actively markets additional GFU franchises.

At the time this litigation was commenced by plaintiffs, GFU was owned by David Klitzky and Steve Bellew. In April of 1998, while this litigation was in the discovery phase, Klitzky and Bellew sold one hundred percent of the outstanding stock to a company called DTWN, Inc. (DTWN).

Since acquiring the GFU stock, DTWN (now known as Franchise Concepts, Inc.) has continued to operate GFU as a separate business, has actively engaged in the supervision of its franchised stores, and has actively sought to sell additional GFU franchises.

The terms of the stock purchase agreement governing DTWN's acquisition of the GFU stock authorized Bellew and Klitzky to act in the name, place and stead of GFU in the litigation. Footnote 1 of the operative schedule of the stock purchase agreement provides:

> Stockholders may continue to prosecute the litigation identified above in the name, place and stead of the Company, but at Stockholders' sole cost and expense. Stockholders shall have the right to compromise, settle, prosecute and appeal such litigation, in their sole discretion. Stockholders shall have the exclusive entitlement to keep royalties or other benefits, rights, judgments and entitlements realized in said litigation.

Klitzky Affidavit (# 47), Exhibit 1.

Defendant states that although the language of the assignment is permissive, the agreement was entered into at a time when the outcome of plaintiffs' claims against GFU was undetermined. Since

GFU was defending against those claims, it did not have the power to dismiss, or to force plaintiffs to settle. Klitzky states in his affidavit that he and Bellew would have been responsible for satisfying any adverse judgment against GFU. Defendant notes the existence of indemnity provisions in the stock purchase agreement.

Thus Klitzky and Bellew in essence were substituted as defendants in this action in place of GFU. If plaintiffs had succeeded in their claims, Klitzky and Bellew, not GFU, would have paid any judgment. If the defense prevailed on its counterclaim, these former shareholders, not GFU, would have received any money judgment.

While there is nothing improper about an assignment of an interest in litigation, I am troubled by the scope of the court's injunction under these circumstances as well as Klitzky and Bellew's purported interest in enforcing it.

As to the latter, Klitzky notes in his affidavit that the post-termination restrictions prevent the proprietary knowledge, systems and training supplied by the franchisor from being used to generate sales that would have otherwise been subject to the payment of a royalty, and thereby provide a disincentive for a franchisee to leave the franchise system. Klitzky further states that the ability of any franchisee to avoid obligations imposed by the franchise or license agreement diminishes the value of the franchise assets, not only with respect to the non-compliant franchisee, but also with respect to the franchisor's ability to hold its other franchisees to their corresponding obligations. In addition, he asserts that efforts to sell additional franchises in the affected markets and elsewhere can be adversely impacted when a former franchisee is not held to the post-

termination restrictions of the franchise agreement. Klitzky then avers that DTWN has additional installment payments to make on its stock purchase agreement, and that his status as a creditor of DTWN, and as an owner of seven GFU franchised stores, gives him an interest in taking action in the name of GFU to promote and protect the well being and integrity of the GFU franchise system.

But all this is a most tenuous foundation on which to build a case for the type of sanctions sought to be imposed against plaintiffs here: Klitzky and Bellew, as the stand-ins for GFU, seek $253,000 ($1,000 per week against each plaintiff for the 104 weeks the plaintiffs operated a framing business within 10 miles of their former franchise, plus $45,000 in fees) for the alleged violation of the court's injunction. This, the defendant contends, must be the result notwithstanding that GFU has not had a franchise in this area during the relevant time period, nor has it asserted any direct interest in precluding plaintiffs from filling custom framing orders out of their warehouse. That DTWN owes Klitzky some more payments for GFU stock hardly convinces me that plaintiffs' actions herein somehow threaten Klitzky's financial interests. And, when one takes into account the entire circumstances, the sanctions sought by defendant would amount to a gross inequity.

First, the Stipulated Judgment contains a latent ambiguity[3] in the text of the "injunction clause." Thus, the injunctive relief section reads in full as follows:

> Plaintiffs are enjoined for a period of two years from the date of this Stipulated Judgment from operating or participating in the operation of, or continu-

---

**3.** Civil contempt consists of a party's disobedience to a " *specific and definite* court order by failure to take all reasonable steps within the party's power to comply." *Go–Video Inc.* *v. Motion Picture Association of America,* 10 F.3d 693, 695 (9th Cir.1993)(emphasis supplied).

ing to participate in the operation of, or from acquiring any financial or beneficial ownership interest in, any business in which picture frames or picture framing components (including molding, mat board and glass) are produced and sold and which is located within 10 miles of the former location of the Great Frame Up framing store on 2190 West 11th Avenue, Eugene, Oregon. *More particularly, plaintiffs are enjoined hereunder for the time period specified herein, from any further operation of the 'Frame It' framing store located at 2190 West 11th Avenue, Eugene, Oregon.*

Stipulated Judgment, p. 2, Exh. 1 to Leiman Affidavit (# 30) (emphasis added).

Plaintiff Stephenson admitted in deposition that throughout the two-year injunctive period he and Jacobsen owned and operated an entity known as Display Contract Services, Inc. (DCS). Stephenson describes DCS as a wholesale custom frame store located within 10 miles of the location of the former GFU business premises on West 11th Avenue in Eugene. Stephenson admitted in deposition and at the evidentiary hearing that during the duration of the injunctive period, DCS was engaged in the framing business.

About two months after the Stipulated Judgment was signed, Adelheid Jacobsen wrote a letter to Bill Brandt, the attorney who represented her and James Stephenson in proceedings related to the initial litigation and the Stipulated Judgment. Among other questions, she asked:

Is Jim allowed to frame orders in his warehouse, which is about one mile away from the original retail store?

Exh. 101.

Attorney Brandt replied:

[I]t would seem to me that Jim would be allowed to frame orders in the warehouse even though it is only a mile away from the original retail store so long as he is not holding himself open to the public as a retail frame shop.

Exh. 102.

Stephenson testified that he operated a wholesale business for interior designers and the like out of a warehouse and that the warehouse was not open to walk in or other retail business. He testified that he was running the business immediately after the signing of the Stipulated Judgment.

Jacobsen and Stephenson's confusion about whether it was permissible to operate a framing business out of the warehouse is perhaps understandable. When the injunction focused on specifics, it enjoined any further operation of the "Frame It" framing store located at 2190 West 11th Avenue, Eugene.

That they acted in good faith is borne out by Jacobsen's letter to their attorney. Brandt was likewise confused. Although he would have better served his clients by obtaining clarification from the court or opposing counsel, Brandt's responsive letter undoubtedly assured the plaintiffs that their actions did not violate the injunction.[4]

 Indeed, under the unique circumstances of this case, I have great difficulty grasping the importance of the general provision in the injunction excluding the operation of any framing business within 10 miles of the former franchise operation. In examining the licensing agreement (on which the injunction is premised), the intent clearly seems to be, in significant part, to protect the value of a licensed franchise by precluding a former licensee from continuing to reap the benefits of the

---

4. "[A] person should not be held in contempt if his action 'appears to be based on a good faith and reasonable interpretation of the [court's order].'" *Go–Video, supra,* at 695 (citation omitted).

goodwill and the commercial value of the franchise and thereby attracting customers without paying royalties. Thus, a former McDonald's franchisee would not be allowed to continue to sell "Big Macs" and fries under golden arches at the same location. But would it make sense to bar the former franchisee from working as a short order cook at Mom and Pop's Cafe simply because it was located within 10 miles of his former operation? Such a situation under those circumstances would fall into a "covenant not to compete" category, which evokes four general requirements in order to be valid:

(1) the restrictions must be partial or restricted in its operation in respect to time or territory;

(2) it must be supported by good consideration;

(3) it must be reasonable, i.e. provide only fair protection, and not be so large in operation to interfere with public interest; and

(4) there must be a protectible interest.

See, *Eldridge v. Johnston*, 195 Or. 379, 403, 245 P.2d 239 (1952).

■ The situation here is analogous. There is no evidence that the plaintiffs' customers at the warehouse were somehow misled into thinking they were dealing with a GFU franchise because of its location (a mile from the original retail store), or that there would have been any difference in either plaintiffs' or GFU's business had plaintiffs moved their warehouse operation across the Willamette River to east Springfield.[5]

To the extent the injunction is intended to enforce a covenant not to compete[6], the plaintiffs' warehouse operation was simply *not* in competition with any GFU franchise. As noted, there has not been any GFU franchise in the Eugene area since the plaintiffs' license was terminated. This is akin to McDonald's razing its hamburger stand and pulling out, yet still trying to enforce a noncompetition agreement against a former franchisee within 10 miles of the abandoned site. Plaintiffs are no more competing with GFU by operating their warehouse in Eugene than they would be in its next-door neighbor Springfield. GFU did not have a store in either location.

Secondly, the nature of plaintiffs' warehouse operation was different then the nature of their former GFU operation. The GFU operation was primarily a do-it-yourself picture framing store where walk-in customers were provided tools, materials and instructions with which to frame, mat, ornament and otherwise provide for the display of their own art, prints, pictures and artifacts. See p. 1 of Licensing Agreement, Exh. A to Notice of Removal(#1). Stephenson testified that the warehouse business, in contrast, was operated for interior designers and the like and was not open to walk-in or other retail business. Stephenson did the framing, not the designers. Thus, little to no protectible information learned by plaintiffs in providing do-it-yourself services in the GFU operation was utilized in the warehouse operation.[7]

---

5. Many businesses operate out of Springfield, and there are undoubtedly numerous warehouse sites there that would have suited the plaintiffs' operation.

6. The preamble to the Stipulated Judgment provides in pertinent part that "plaintiffs and defendants stipulate that plaintiffs are subject to a Covenant Not to Compete with defendant The Great Frame Up Systems, Inc. and have

agreed that the Covenant Not to Compete should be enforced and enforced as set forth below:"

7. This provides another reason for not finding plaintiffs liable that is alternative to all of the above. It can be said that plaintiffs substantially complied with the injunction. The injunctive language at issue in this case arises from Section 6b of the Licensing Agreement

Third, GFU's lack of a franchise in this area coupled with the lack of any further interest in the litigation after the stock sale of April, 1998 poses some interesting questions that highlight the concerns I have with Klitzky and Bellew's enforcement action. What if plaintiffs' attorney had sought permission to continue the warehouse operation at the Eugene site? Had he known the particulars of the GFU stock transaction, could he have sought permission from GFU? After all, GFU is the entity with the protectible interest in the non-compete covenant. Or does the assignment of the interest in this litigation to Klitzky and Bellew make them the assignees of the non-compete covenant [with GFU] as well? But what justifies their interest in a non-compete covenant with an entity they no longer own? The fact that Klitzky is a GFU franchisee in the Midwest hardly seems sufficient, nor does his highly speculative concern about the ability of DTWN to make future installment payments on the stock deal because the value of the GFU franchises may somehow be impacted by plaintiffs' activities.

This leads me to another concern: Klitzky and Bellew's lack of any real interest in a non-compete covenant between plaintiffs and GFU is easily transformed into an incentive to allow supposed violations of the covenant to continue unabated. Plaintiffs operated their warehouse business for the full two years covered by the agreement, incurring potential penalties of $2,000/week for 104 weeks. As GFU had no franchise in town, it was suffering no damage from plaintiffs' actions. Under these conditions, the real interest of anyone in Klitzky or Bellew's shoes is to keep his whistle in his pocket until after the entire period has expired!

Had I known the true state of events when the court was asked to sign off on the Stipulated Judgment, I would certainly have questioned the reasonableness of the ten mile prohibition. Had attorney Brandt sought clarification of that issue when his client questioned the scope of the injunction, I would, upon discovering the actual circumstances from the defendant, have deleted that portion of the order.

 It is not too late to rectify the overreaching scope of this injunction. Although defendant characterizes this as a consent judgment and contends that it cannot be revisited at this stage of the proceedings[8], the judgment includes a court order in the form of an injunction. A court awarding equitable relief in the form of an injunction has the inherent authority to change or modify the terms of the injunctive relief as circumstances and justice warrant. *See generally, United States v. Swift & Co.*, 286 U.S. 106, 114, 52 S.Ct. 460, 76 L.Ed. 999 (1932); *Chrysler Corporation v. United States*, 316 U.S. 556, 62 S.Ct. 1146, 86 L.Ed. 1668 (1942); *Leslie*

---

which is tied to a recital in section 6a that any appropriation or duplication of the do-it-yourself framing "system" will seriously impair the value of licensor's business. P. 5 of Licensing Agreement, Exh. A to Notice of Removal (# 1). The Ninth Circuit in *Go–Video, supra,* examined a very broad injunction and found no violation due to substantial compliance because a reasonable reading of an injunction must connect prohibitions to their recited purposes. *Go–Video,* 10 F.3d at 695. Similarly, the broad injunction in the present case was for the protection of the do-it-yourself "system" and any violation arising from the warehouse operation was not a violation beyond substantial compliance.

8. *See, Twentieth Century–Fox Film Corporation v. Dunnahoo,* 637 F.2d 1338 (9th Cir. 1981). But *Dunnahoo* is distinguishable, as this court is not revisiting a sum certain monetary judgment (the focus of the holding in that case), but rather is addressing the reasonableness of the terms of the underlying injunction in light of circumstances that were not known and had not been disclosed to the court at the time the order was entered.

*Salt Co. v. United States,* 55 F.3d 1388, 1393 (9th Cir.1995).

As set forth above, the court was unaware until the hearing on defendant's motion for penalties that GFU had assigned all interest in this litigation to its former shareholders, and that GFU has had no franchises within the Eugene area during the two years that plaintiffs operated their warehouse framing business. For these and the additional equitable considerations discussed, I hereby modify the injunction to delete the first sentence thereof, i.e.,

> Plaintiffs are enjoined for a period of two years from the date of this Stipulated Judgment from operating or participating in the operation of, or continuing to participate in the operation of, or from acquiring any financial or beneficial ownership interest in, any business in which picture frames or picture framing components (including molding, mat board and glass) are produced and sold and which is located within 10 miles of the former location of the Great Frame Up framing store on 2190 West 11th Avenue, Eugene, Oregon.

Stipulated Judgment, p. 2, Exh. 1 to Leiman Affidavit (# 30).

With this deletion, the only provision remaining is that which enjoins plaintiff from any further operation of the "Frame It" framing store located at 2190 West 11th Avenue, Eugene Oregon for a period of two years (beginning September 3, 1998).

I make this modification *nunc pro tunc,* as of September 3, 1998.

Accordingly, I find no violation of the injunction and deny defendant's motion for the penalties and attorney fees arising from the alleged violation of the injunction.

## II.

### DEFENDANT WOULD NOT BE ENTITLED TO PENALTIES OF $2,000/ WEEK IN ANY EVENT

As an alternative ground for denying defendant's motion for penalties, I reject defendant's argument that the $2,000/ week liquidated damages penalty ($1,000 per each of the individual plaintiffs) is a sum certain final judgment that may not be set aside absent certain specified circumstances pursuant to Fed. R. Civ P. 60.[9] This penalty provision has not been reduced to a sum certain and thus is not a final judgment. The provision is interlocutory and not subject to the restrictions of Rule 60. *See New Shows v. Don King Productions, Inc.,* 2001 WL 668927, *3 (S.D.N.Y.2001), *reconsideration denied,* 2001 WL 882999 (2001). Because the penalty provision of the Stipulated Judgment is interlocutory, it is subject to the power of the court to afford such relief from it as justice requires. *Id.* at ftnt 5.

The penalty provision is not a sum certain as it is necessary for the court to conduct a hearing and determine how many weeks of violation there have been and who was involved. Any sum due must be determined subsequent to the signing of the Stipulated Judgment and can vary greatly based on the court's findings on these two separate inquiries, e.g., it could be from $1,000 to $208,000.[10]

Since I would be free to revisit the penalty clause notwithstanding the restrictions of Rule 60, I would award no penalties for the following independent reasons:

9. *See Twentieth Century–Fox Film Corporation v. Dunnahoo, supra.*

10. Such is contrasted to the situation in *Dunnahoo, supra,* where the stipulated judgment mandated damages of the flat sum amount of $40,000 for any violation of the judgment.

First, I would decline to hold the plaintiffs in contempt because of my finding that their actions were based on a good faith and reasonable interpretation of the court order. [See discussion in section I of the court's order. Also see *Go–Video Inc.*, *supra*, at p. 695.]

Second, the penalty provision in this case is just that—a penalty—and not a genuine preestimation of actual injury to the defendant incurred as the result of any violation.[11] As discussed in Section I of this order, GFU has suffered no harm whatsoever by the plaintiffs' actions, nor was it ever likely to given the absence of a franchise in the area. An award to Klitzky and Bellew of $208,000 would be a sheer windfall, not compensation for damages suffered by GFU. The penalty clause is thus unenforceable. *See generally, Ditommaso Realty Inc. v. Moak Motorcycles, Inc.*, 309 Or. 190, 785 P.2d 343, (1990); *Harty v. Bye*, 258 Or. 398, 483 P.2d 458 (1971); *Medak v. Hekimian*, 241 Or. 38, 404 P.2d 203 (1965); *Illingworth v. Bushong*, 297 Or. 675, 688 P.2d 379 (1984).[12] *See also, General Signal Corp. v. Donall-*

co, 787 F.2d 1376, 1380 (9th Cir.1986) (compensatory contempt award is generally limited to actual loss for injuries which resulted from noncompliance with the injunction.).[13]

## CONCLUSION

For the reasons stated, the court denies defendant's motion (# 27) for an order finding that plaintiffs have violated the terms of the Stipulated Judgment and awarding penalties and fees.

Plaintiffs' Rule 60(b)(6) motion (# 48) is allowed to the extent it is consistent with the above.

**11.** In addition to the above, it does not appear from Mr. Brandt's testimony at the hearing that the parties meaningfully negotiated the penalty and such indicates that there was no genuine preestimation of injury, thereby rendering agreed damages not a reasonable forecast of just compensation for the harm. *See Dean Vincent, Inc. v. McDonough*, 281 Or. 239, 246, 574 P.2d 1096 (1978), *rev'd on other grounds, DiTomasso, infra.*

**12.** In coming to its finding on the penalty matter, this court also considered the difficulties of proof of loss and the inconvenience or nonfeasability of otherwise obtaining an adequate remedy. See ORS 72.7180(1).

**13.** In addition to and as an alternative to the above, the above reasons also justify relief under plaintiffs' Rule 60(b)(6) motion directed at the penalty provision of Section V(B) of the Stipulated Judgment. Rule 60(b)(6) allows the court, "upon such terms that are just," to relieve a party from a final judgment for "(6) any other reasons justifying relief from the

operation of the judgment." A Rule 60(b)(6) motion generally requires extraordinary circumstances which prevent or render a party unable to prosecute an appeal. The fact that the penalty provision was interlocutory and not a final judgment as required for an appeal addresses this issue. The motion also must be timely, but Jacobsen's interpretation of the scope of the judgment based on attorney Brandt's letter provides a basis for Jacobsen's interpretation of the scope of the judgment to be reasonable and where a belief in these circumstances is objectively reasonable and there is no prejudice, the motion is deemed timely. *See United States v. Holtzman*, 762 F.2d 720, 725 (9th Cir.1985). Moreover, the fact that the motion was not filed until three years after the Stipulated Judgment was signed is mitigated somewhat by the fact GFU did not assert a violation of the injunction until the two year period covered by the injunction was completed.